O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **MODERN TELECOM SYSTEMS LLC,**<br><br>　　**Plaintiff,**<br><br>vs.<br><br>**EARTHLINK, INC.,**<br>　　**Defendant.** | **Case No.: SA CV 14-0347-DOC (ANx)**<br><br><br>**ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS [42]** |

　　This case is one of several related patent infringement cases concerning the same group of patents owned by Plaintiff Modern Telecom Systems LLC ("Plaintiff"). Before the Court is the Motion for Judgment on the Pleadings (the "Motion") filed by Defendant Earthlink, Inc. ("Defendant") (Dkt. 42). Defendant argues that the patents in suit are patent-ineligible under 35 U.S.C. § 101. In related cases *Modern Telecom Systems LLC v. Juno Online Services, Inc., et al.*, Case No. SACV 14-0348 and *Modern Telecom Systems LLC v. Lenovo Group Limited et al.*, Case No. SACV 14-1266, the respective defendants filed motions on the same basis. Oral argument for the motions in all three cases was heard on March 2, 2015. After considering the

relevant briefings and oral argument, the Court hereby DENIES the Motion for the reasons stated in the attached order from *Modern Telecom Systems LLC v. Juno Online Services, Inc., et al.*, Case No. SACV 14-0348.

*[signature: David O. Carter]*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated: March 17, 2015

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| MODERN TELECOM SYSTEMS LLC, | Case No.: SA CV 14-0348-DOC (ANx) |
|---|---|
| Plaintiff, | |
| vs. | ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS [37] |
| JUNO ONLINE SERVICES, INC., et al., | |
| Defendants. | |
| JUNO ONLINE SERVICES, INC., et al., | |
| Counterclaimants, | |
| vs. | |
| MODERN TELECOM SYSTEMS LLC, | |
| Counterdefendant. | |

This case is one of several related patent infringement cases concerning the same group of patents owned by Plaintiff Modern Telecom Systems LLC ("Plaintiff"). Before the Court is the Motion for Judgment on the Pleadings (the "Motion") filed by Defendants Juno Online Services, Inc. and Netzero, Inc. (collectively, "Defendants") (Dkt. 37). Defendants argue that the patents in suit are patent-ineligible under 35 U.S.C. § 101. In related cases entitled *Modern Telecom Systems LLC v. Earthlink, Inc.*, Case No. SACV 14-0347 and *Modern Telecom Systems LLC v. Lenovo Group Limited et al.*, Case No. SACV 14-1266, the respective defendants filed motions on the same basis. Oral argument for the motions in all three cases was heard on March 2, 2015. After considering the relevant briefings and oral argument, the Court hereby DENIES the Motion.

## I.  BACKGROUND

In its complaint, Plaintiff Modern Telecom Systems LLC ("Plaintiff") asserts claims of patent infringement of six related patents: U.S. Patent No. 6,504,886 ("the '886 patent"), issued on January 7, 2003; U.S. Patent No. 6,332,009 ("the '009 patent"), issued on December 18, 2001; U.S. Patent No. 6,570,932 ("the '932 patent"), issued on May 27, 2003; U.S. Patent No. 6,163,570 ("the '570 patent"), issued on December 19, 2000; U.S. Patent No. 7,062,022 ("the '022 patent"), issued on June 13, 2006; and U.S. Patent No. 5,970,100 ("the '100 patent"), issued on October 19, 1999.

### A. The Learning Sequence Patents

The parties refer to the '886 patent and the '009 patent as "Learning Sequence Patents." The Abstract of each of these two patents states,

> A modem system includes a programmable synchronization signal format that can be configured at a first modem in response to a request received from a second modem. The synchronization signal format may define a number of parameters of the synchronization signal, such as the sign pattern for symbols transmitted by the first modem during a training sequence.

First Amended Complaint ("FAC"), Dkt. 19, Ex. A. Plaintiff contends that the Learning Sequence Patents "teach improved methods of impairment learning for use in a digital communication system, such as a 56 kbps modem system." Plaintiff's Opposition ("Opp'n"),

Dkt. 39, 3:7-8. Plaintiff explains the process taught by the Learning Sequence Patents as follows:

> The [digital communication] system transmits a learning sequence descriptor of a specified format and a learning signal based on the learning sequence descriptor. The receiver can then compare the known learning signal with the received signal to learn an impairment of the communication channel. The Learning Sequence Patents describe specific methods of constructing and transmitting learning sequences and learning sequence descriptors that improve impairment learning in various communication channels.

Opp'n, 3:10-16.

Between the two patents, Plaintiff asserts 37 claims. Defendants characterize claim 5 of the '886 patent and claim 44 of the '009 patent as representative of the other claims in the two respective patents.

Claim 5 of the '886 patent recites:

A method of communicating a learning sequence, said method comprising:

> receiving a first parameter specifying a number of segments in said learning sequence;
>
> receiving a second parameter specifying a sign pattern of each of said segments;
>
> receiving a third parameter specifying a training pattern of each of said segments, wherein said training pattern is indicative of an ordering of a reference symbol and a training symbol in each of said segments;
>
> constructing said learning sequence based on said parameters; and
>
> transmitting said learning sequence.

Claim 44 of the '009 patent recites:

An impairment learning method for use over a communication channel, said method comprising:

> transmitting a learning sequence descriptor over said communication channel, said learning sequence descriptor having a training symbol order;
>
> receiving a learning signal over said communication channel, said learning signal having a member of segments, each of said segments being associated with a sequence of symbols configured in accordance with said learning sequence descriptor, wherein said training symbol order is indicative of an assignment of a plurality of training symbols to said number of segments; and
>
> learning an impairment of said communication channel according to said learning signal.

-3-

### B. The Power Level Calculation Patents

The parties refer to the '932 patent and the '570 patent as the "Power Level Calculation Patents." The Abstract of each of these two patents states,

> A pulse code modulation modem system utilizes the same total average transmit power formula for designing signal point constellations and for verifying that the transmit power of the signal point constellations are within a designated maximum power limit. The transmit power of the signal point constellations designed by the client modem is also calculated by the server modem to verify that the transmit power limit imposed upon the server modem is not exceeded.

FAC, Ex. C. Plaintiff contends that the Power Level Calculation Patents

> teach a modem system wherein the total average transmit power of a signal point constellation set is calculated using a particular formula by an analog modem and verified by a digital modem using the same power formula. This improves upon prior art 56 kbps modem systems which may designate training sequences in advance without regard to any transmit power limitations imposed on the digital modem or current operating conditions such as the presence of robbed bit signaling or digital pads (digital impairments).

Opp'n, 3:23-4:2.

Between the two patents, Plaintiff asserts 9 claims. Defendants characterize claim 7 of the '932 patent and claim 1 of the '570 patent as representative of the other claims in the two respective patents.

Claim 7 of the '932 patent recites:

> A method of communicating over a communication channel using a constellation including a plurality of signal points, said method comprising:
>
>> determining a probability of transmission of each signal point of said constellation;
>>
>> calculating an average power of said signal points using a power formula based on said probability of transmission of each said signal point; and
>>
>> comparing said average power with a transmit power limit.

Claim 1 of the '570 patent recites:

> A method for verifying transmit power levels in a signal point limited transmission system, wherein said system having: a first device configured to communicate with a second device over a communication channel; said method comprising the steps of:
>
>> receiving at said first device, a plurality of signal points from said second device, said plurality of signal points having a first computed transmit power, as determined by said second device, less than or equal to a transmit power limit,

-4-

    said first computed transmit power being calculated in accordance with a transmit power calculation formula;

    calculating, at said second device, said second computed transmit power of said plurality of signal points; and

    comparing, at said first device, said second computed transmit power with said transmit power limit, to determine whether said second computed transmit power is less than or equal to said transmit power limit.

### C. The Fast Start-Up Patent

The parties refer to the '022 patent as the "Fast Start-Up Patent." The Abstract of the '022 patent states, "A fast startup procedure for a modem system utilizes known characteristics of a previously established communication channel to reduce the initialization period associated with subsequent connections over the same channel." FAC, Ex. D. Plaintiff contends that the Fast Start-Up Patent teaches a fast startup procedure in which the data transmission system "determine[s] whether characteristics of the current channel are similar to stored characteristics associated with a previous connection of the same channel." Opp'n, 4:8-11. If a "match" is found, the system carries out an initialization routine in less time than it takes under the procedures or protocols that are carried out in a conventional system startup process. Opp'n, 4:11-15.

Plaintiff asserts 4 claims (1, 2, 7, and 10) of the '022 patent. Defendants characterize claim 1 of the '022 patent as representative.

Claim 1 of the '022 patent recites:

A method for reducing startup latency associated with a data transmission system having a first device configured to communicate with a second device over a communication channel, said method comprising the steps of:

    establishing a call between said first device and said second device;

    determining whether a characteristic of said communication channel is similar to a corresponding characteristic associated with a previously established communication channel; and

    initializing at least one of said first and second devices using a number of stored parameters associated with said previously established communication channel, said initializing step being performed if said determining step determines that said characteristic is similar to said corresponding characteristic.

### D. The Spectrum Frequency Patent

The parties refer to the '100 patent as the "Spectrum Frequency Patent." The Abstract of the '100 patent states, "Methods and apparatus are disclosed for shaping and controlling the spectrum of transmitted samples with a set of predetermined frequency characteristics and a predetermined set of allowable transmitted signal levels are disclosed."[1] FAC, Ex. F. Plaintiff contends that the Spectrum Frequency Patent teaches a method for calculating a measure of unwanted components, computing an objective function based on the running measure, and then selecting at least one redundant sample to optimize the objective function. Opp'n 4:22-5:3.

Plaintiff asserts 10 claims (1, 2, 8, 9, 15-17, and 26-28) of the '100 patent. Defendants characterize claim 1 of the '100 patent as representative.

Claim 1 of the '100 patent recites:

A method of spectrally shaping transmitted samples with a set of predetermined frequency characteristics and a predetermined set of allowable transmitted signal levels, wherein a transmitted sample is either of an unmodified source sample or a dependent sample, the transmitted samples being transmitted in data frames, said method comprising the steps of:

> (a) calculating, for each of the transmitted samples, a Running Filter Sum of unwanted components up to the current sample, wherein said Running Filter Sum is based on a biquad filter;
>
> (b) computing an objective function in accordance with the Running Filter Sum obtained in Step (a);
>
> (c) selecting, for each data frame of transmitted samples, at least one redundant sample to be added or modified within the data frame such that the objective function of Step (b) is optimized.

## II. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for a Rule 12(c) motion for judgment on the pleadings is the same as for motions to dismiss brought under Rule 12(b)(6). *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). As such, the court need only accept as true those allegations which are facially plausible; the pleadings must provide "more than labels and conclusions, and a formulaic recitation of the

---

[1] Plaintiff alleges infringement of method patent claims only.

-6-

elements . . . will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For purposes of a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984)); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967). Judgment on the pleadings is proper when the moving party "clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios*, 896 F.2d at 1550; *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978-79 (9th Cir. 1999). Thus, the defendant is not entitled to judgment on the pleadings if the complaint raises issues of fact, which, if proved, would support recovery. *Cf. Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (affirming the grant of a defendant's Rule 12(c) motion where the complaint raised only an issue of law, not fact). Likewise, the plaintiff is not entitled to judgment on the pleadings if the answer raises issues of fact or an affirmative defense, which, if proved, would defeat the plaintiff's recovery. *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

### III. PATENT ELIGIBILITY UNDER 35 U.S.C. § 101

#### A. Test for Patent Eligibility from *Mayo* and *Alice*

Section 101 of the Patent Act provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, __ U.S. __, 134 S. Ct. 2347, 2354, 189 L. Ed. 2d 296 (2014). "The concern that drives this exclusionary principle" is "one of pre-emption." *Id.* In other words, the concern is "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Id.* (quoting

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, __ U.S. __, 132 S. Ct. 1289, 1301, 182 L.Ed.2d 321 (2012)). *Alice* warns courts, however, to "tread carefully in construing this exclusionary principle lest it swallow all of patent law," because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1293).

In *Alice*, the Court followed the framework it established in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355. First, the court asks "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If so, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1298, 1297). In this second step, the court looks for an "inventive concept"—that is, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

This standard is easier to articulate than it is to apply. "The line between a patentable 'process' and an unpatentable 'principle' is not always clear." *Parker v. Flook*, 437 U.S. 584, 589 (1978). The Federal Circuit has referred to § 101 jurisprudence as a "murky morass." *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1259 (Fed. Cir. 2012) (suggesting, in dicta, that "courts could avoid the swamp of verbiage that is § 101" by addressing patentability defenses under §§ 102, 103, and 112 before addressing patent eligibility under § 101). Judge Pfaelzer recently lamented that "Supreme Court decisions on § 101 often confuse more than they clarify." *California Inst. of Tech. v. Hughes Commc'ns Inc.*, 2014 WL 5661290, at *3 (C.D. Cal. Nov. 3, 2014); *see also MySpace, Inc.*, 672 F.3d at 1259 ("Our opinions spend page after page revisiting our cases and those of the Supreme Court, and still we continue to disagree vigorously over what is or is not patentable subject matter."). Pinning down the exclusion for "abstract ideas" can be particularly challenging. *See MySpace, Inc.*, 672 F.3d at 1259 ("When it

comes to explaining what is to be understood by 'abstract ideas' in terms that are something less than abstract, courts have been less successful.").

### B. Ripeness of Deciding Patent Eligibility

Patent eligibility under § 101 is a question of law that may, in appropriate cases, be decided on the pleadings without the benefit of a claims construction hearing. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming district court's decision to grant motion to dismiss based on patent-ineligible subject matter under § 101 without having a claims construction hearing); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014) (same); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.). However, "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs.*, 687 F.3d at 1273-74; *see also Content Extraction*, 776 F.3d at 1349 ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101.").

In its opposition, Plaintiff argued that claim construction is necessary in order for the Court to decide the Motion. Opp'n, 9:6-10:17. At the hearing on the Motion, however, the parties stipulated that claim construction is not necessary before resolving the Motion. Plaintiff, instead, reiterated its position that Defendants failed to meet their burden of showing the patents in suit are ineligible under § 101.

### C. Defendants' Burden

The parties dispute Defendants' burden in connection with the Motion. Plaintiff argues its patents are presumed valid and Defendants bear the burden of proving by clear and convincing evidence that the patents claim patent-ineligible subject matter. Opp'n, 5:5-17. Plaintiff relies on 35 U.S.C. § 282(a), which states: "A patent shall be presumed valid . . . . The

burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

Defendants argue that the clear and convincing evidence standard does not apply to patent-eligibility challenges under § 101. They argue that patent-eligibility is a question of law and the clear and convincing standard only applies to questions of fact. Motion, 10:13-11:2.

The Court agrees with Defendants that the clear and convincing evidence standard is not necessarily applicable in the context of determining patent-eligibility under § 101, which is a question of law. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011) ("Issues of patent-eligible subject matter are questions of law."); *Hughes Commc'ns*, 2014 WL 5661290, at *2 n.6 ("This Court believes that the clear and convincing evidence standard does not apply to § 101 analysis, because § 101 eligibility is a question of law.").

As discussed above, particularly after *Alice*, courts have frequently decided patent-eligibility on the pleadings. *See, e.g.*, *Content Extraction*, 776 F.3d at 1349; *Ultramercial*, 772 F.3d at 711; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming district court's decision to grant judgment on the pleadings based on § 101); *Morsa v. Facebook, Inc.*, 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014) (granting motion for judgment on the pleadings); *Intellectual Ventures I LLC v. Manufacturers & Traders Trust Co.*, 2014 WL 7215193 (D. Del. Dec. 18, 2014) (granting, in part, motion to dismiss). *But see StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, No. 8:13-CV-2240-T-33MAP, 2015 WL 518852 (M.D. Fla. Feb. 9, 2015) (denying motion for judgment on the pleadings, finding claim construction was necessary because parties disputed the character of the claims); *Data Distribution Technologies, LLC v. BRER Affiliates, Inc.*, 2014 WL 4162765 (D.N.J. Aug. 19, 2014) (denying motion to dismiss because patent eligibility was not ripe for adjudication).

Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a "clear and convincing evidence" standard—a burden of *proof*—to such motions. *Cf. Content Extraction*, 776 F.3d at 1348-49 (rejecting argument that clear and convincing evidence standard required court to address all patent claims). As Judge Mayer points out in his

concurring opinion in *Ultramercial*, "Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility. The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the section 101 calculus." *Ultramercial*, 772 F.3d at 720-21 (Mayer, J., concurring).

Although the clear and convincing evidence standard is not applicable to the Motion, Defendants, as the parties moving for relief, still bear the burden of establishing that the claims are patent-ineligible under § 101. Additionally, in applying § 101 jurisprudence at the pleading stage, the Court construes the patent claims in a manner most favorable to Plaintiff. *See Content Extraction*, 776 F.3d at 1349.

### IV. ANALYSIS

#### A. Step One of the *Mayo* Test

Under the first step of the *Mayo* test, the Court must determine whether the patent claims at issue are directed to abstract ideas.

As an initial matter, the Court notes that, "identifying the precise nature of the abstract idea" to which Plaintiff's patent claims are directed "is not as straightforward as in *Alice* or some of [the Federal Circuit's] other recent abstract idea cases." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). For example, the claims in *Alice* were directed to the abstract idea of intermediated settlement, "*i.e.,* the use of a third party to mitigate settlement risk," and "simply instruct[ed] the practitioner to implement the abstract idea . . . on a generic computer." *Alice*, 134 S. Ct. at 2356, 2359. In *Ultramercial*, 772 F.3d at 715, the claims were directed to the abstract idea of "using advertisement as an exchange or currency." In *buySAFE*, 765 F.3d at 1355, the claims simply invoked a generic computer to implement the abstract concept of "creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." In *Content Extraction*, 776 F.3d at 1347, the claims were "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." In *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed.

Cir. 2014), the claims simply recited "a process of taking two data sets"—which were "generated by taking existing information . . . and organizing this information into a new form"—and "combining them into a single data set."

Although determining whether the patents in suit are directed to an abstract idea is not as easy as the cases discussed above, under the Federal Circuit's broad formulation of the first step of the *Mayo* test, *see, e.g.*, *Ultramercial*, 772 F.3d at 715 (combination of steps in patent claim "recites an abstraction—an idea, having no particular concrete or tangible form"), one could conceivably conclude that all process or method patents, like the patents in suit, are directed to an abstract idea.[2] In fact, even cases Plaintiff relies on found the patents in suit directed to patent-ineligible subject matter. *See Hughes Commc'ns*, 2014 WL 5661290, at *15; *Card Verification Solutions, LLC v. Citigroup Inc.*, 2014 WL 4922524, at *4 (N.D. Ill. Sept. 29, 2014) ("Even when looking at the patent in the light most favorable to Card Verification, it is directed toward a patent-ineligible abstract idea.").

The representative claims of the Learning Sequence Patents (claim 5 of the '866 and claim 44 of the '009 patent) describe a method of communicating certain descriptors, signals, data, etc. between two devices (presumably modems) over a data communication channel. The representative claims of the Power Level Calculation Patents (claim 7 of the '932 patent and claim 1 of the '570 patent) describe using specific formulas to calculate modem power levels in signals transmitted over a data communication channel. The representative claim of the Fast Start-Up Patent (claim 1 of the '022 patent) describes a method of reducing startup latency between two devices configured to communicate with each other over a data communication channel. The representative claim of the Spectrum Frequency Patent (claim 1 of the '100 patent) describes a method for error correction in data communication channel impairment. Each of these methods is conceptual in nature. Ultimately, however, the Court need not decided

---

[2] Interpreted broadly, the Federal Circuit's holding in *Digitech* could lead one to conclude that software is categorically patent-ineligible. *See Hughes Commc'ns*, 2014 WL 5661290, at *9 (discussing and rejecting interpretation of the Federal Circuit's holding in *Digitech* results in the conclusion that all software is not patentable).

whether the patents are "directed to" an abstract idea because, as discussed below, Defendants have failed to meet their burden of establishing that the patents in suit lack an inventive concept such that they are no more than a patent on an abstract idea.

### B. Step Two of the *Mayo* Test

Under the second step of the *Mayo* test, the Court considers whether the elements of each claim, either individually or "as an ordered combination," include an "inventive concept" such that "'the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

Defendants argue that each of the representative patent claims lack an inventive concept. Defendants' argument amounts to a recitation of the elements of each representative claim followed by a conclusory characterization of the claims as "unlimited," "so abstract and sweeping as to cover any and all uses of them," and "recit[ing] nothing more than an ineligible concept." *See generally* Motion, 10-21.[3] Defendants correctly point out that the patents concern software that controls the way a user modem communicates with a telephone company modem. However, Defendants have failed to demonstrate that the specific steps recited in the patents pre-empt all inventions concerning communicating between two modems.

The claims here "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *See DDR Holdings*, 773 F.3d at 1257. *Cf. Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions. And banks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of account holder, and stored that information in their records."). Instead, like the claims in *DDR Holdings*, Plaintiff's claims appear to describe a solution that is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings*,

---

[3] In the related case of *Modern Telecom Systems LLC v. Lenovo Group Limited et al.*, Case No. 14-CV-1266, Defendant Lenovo (United States) Inc. offers similar conclusory characterizations. For example, Lonovo states that the claims of the Learning Sequence Patents simply describe the "well-known practice of exchanging information." Case No. 14-CV-1266, Dkt. 20, 15:7-10.

-13-

773 F.3d at 1257. Thus, the patent claims here are at least potentially distinguishable from the patents in the cases cited by Defendants. For example, unlike in *Content Extraction*, *Ultramercial*, and *buySAFE*, here there is no record of the technology described in the patents being well-known at the time of filing or simply involving performance of "well-understood, routine, and conventional activities commonly used in the industry." *See Content Extraction*, 776 F.3d at 1348. *Cf. id.* ([Patentee] conceded at oral argument that the use of a scanner or other digitizing device to extract data from a document was well-known at the time of filing, as was the ability of computers to translate the shapes on a physical page into typeface characters."); *Ultramercial*, 772 F.3d at 716 ("[E]ach of those eleven steps merely instructs the practitioner to implement the abstract idea with 'routine, conventional activit[ies], which is insufficient to transform the patent-ineligible abstract idea into patent-eligible subject matter." (second alteration in original)); *buySAFE*, 765 F.3d at 1355 (holding that the subject of the patent claims was "beyond question of ancient lineage").

Defendants emphasize the "software focus" of the patents as if recent Federal Circuit cases support a rule that software is categorically patent-ineligible. The Court does not interpret the cases that way and, instead, agrees with the conclusion in *Hughes Commc'ns* that "software *must* be eligible under § 101." *Hughes Commc'ns*, 2014 WL 5661290, at *7 (emphasis added).

Ultimately, Defendants bear the burden of making clear "[t]he line between a patentable 'process' and an unpatentable 'principle'" in the context of Plaintiff's patent claims. *Flook*, 437 U.S. at 589; *see also DDR Holdings*, 773 F.3d at 1255 ("Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear."). Under the current procedural posture, Defendants have failed to meet their burden. Defendants are free, however, to challenge the patent eligibility of Plaintiff's patents at a later stage upon a more complete evidentiary record.[4]

---

[4] In concluding that Defendants failed to meet their burden, the Court has considered only the patent claims Defendants characterized as representative. The Federal Circuit recently confirmed that it is not necessary to address each claim when one claim (or more) is representative—that is, when the remaining claims are "substantially similar in that they recite little more than the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (affirming grant of

Defendants' Motion is DENIED without prejudice as to Defendants' right to raise patent eligibility at a later stage in the case.

### IV.     DISPOSITION

Defendants' Motion for Judgment on the Pleadings is DENIED without prejudice.

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated:  March 17, 2015

---

motion to dismiss based on § 101 analysis of representative claims). In its opposition, Plaintiff argued that each claim it asserts must be considered independently when conducting § 101 analysis. However, Plaintiff failed to explain how the claims identified by Defendants are not representative. At the hearing, Plaintiff pointed out a number of differences in the precise limitations recited in the claims but did not articulate why such differences matter for purposes of patent eligibility. If Defendants raise the issue of patent-eligibility under § 101 at a later stage (e.g., summary judgment) and Plaintiff is unwilling to stipulate that certain patent claims are representative of others, Plaintiff is advised to explain how differences in the claims are meaningful in light of § 101 jurisprudence.